UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

XENOPHON BEAKE II,

    Plaintiff,

     v.

MARITIME ENERGY,

    Defendant.

Civil Action No.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Xenophon Beake II ("Mr. Beake"), by and through

undersigned counsel, and complains against the Defendant, Maritime Energy ("Maritime"), as

follows:

JURISDICTION AND PARTIES

1.      This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§

4551 *et seq.,* the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§831 *et seq.*, as enforced

through the MHRA; and Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et*

*seq*.

2.      Mr. Beake is a United States citizen residing in the Town of South Thomaston,

County of Knox, State of Maine.

3.      Maritime Energy is a Maine business corporation with a main office in the City of

Rockland, County of Knox, State of Maine.

4.      Maritime Energy had 15 or more employees for each working day in each of 20 or

more calendar weeks in the same calendar year as when the alleged discrimination occurred.

5.     This Court has subject matter jurisdiction over Mr. Beake's federal and state claims pursuant to 28 U.S.C. §§ 1331and 1367.

6.     On February 10, 2020, Mr. Beake filed a timely Complaint/Charge of Discrimination against Maritime Energy alleging unlawful sex, retaliation, and whistleblower retaliation claims with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

7.     On or about August 18, 2020, the MHRC issued a Notice of Right to Sue with respect to Mr. Beake's state law claims.

8.     On or about August 20, 2020, the EEOC issued a Notice of Right to Sue with respect to Mr. Beake's federal law claims.

9.     Mr. Beake has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

<u>JURY TRIAL REQUESTED</u>

10.     Mr. Beake requests a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

11.     Maritime Energy operates 13 convenience stores in mid coast Maine.

12.     Mr. Beake is male.

13.     Mr. Beake was employed by Maritime Energy as District Manager from September 26, 2016 until he was wrongfully terminated on October 31, 2019.

14.     Susan Ware Page is the President of Maritime Energy.

15.     Jeff Snow is the Human Resources Manager.

16.     Mr. Beake reported to Vice President of Store Operations Charon Curtis.

17.     Ms. Curtis has worked in the convenience store industry for 33+ years, and for Maritime Energy for 10+ years.

Sex discrimination

18.     Ms. Curtis treated Mr. Beake differently and less favorably because of his sex.

19.     According to Defendant, the convenience store business is a female-dominated industry.

20.     That means that Ms. Curtis has worked in a female-dominated industry for over three decades.

21.     Ms. Curtis' treatment of Mr. Beake as compared to the way she treated female Store Managers and a female District Manager evidences bias by Ms. Curtis against men.

22.     One employee commented to Mr. Beake, "You're being treated differently because you're a man. She [Ms. Curtis] would never treat the Store Managers that way. She's discriminating against you."

23.     Another employee who witnessed Ms. Curtis's unfair treatment of Mr. Beake commented that Ms. Curtis is a "man-hater."

24.     A third employee commented to Mr. Beake, when he was fired, that "Ms. Curtis got her way and now has an all-female management staff."

25.     Other than Mr. Beake, all of the managers who reported directly and indirectly to Ms. Curtis were female including Kim Snow[1], a District Manager who was hired in about June 2019 after Mr. Beake had complained several times about being mistreated by Ms. Curtis.

26.     Upon information and belief, Ms. Snow was hired to replace Mr. Beake.

---

[1] Kim Snow is Mr. Snow's wife.

27.     Females (Ms. Snow and perhaps Ms. Curtis) assumed  Mr. Beake's job duties (male) when he was fired.

28.     One of the ways Ms. Curtis treated Mr. Beake differently and less favorably on the basis of sex in the terms and conditions of employment was to permit female Store Managers to verbally abuse Mr. Beake, in her presence, without any objection.

29.     For example, on or around March 2018, HR Manager Jeff Snow and Mr. Beake conducted an investigation into complaints of hostile work environment at the Rockport Maritime Farms store.

30.     Mr. Snow and Mr. Beake interviewed all of the employees who worked there.

31.     Mr. Snow and Mr. Beake found that Store Manager Pat McGray, Assistant Store Manager Donna Ward, as well as hourly employees Linda, Sue, and Cindy, had all contributed to creating a hostile work environment.

32.     After the investigation concluded, a meeting took place in the basement of the main office to discuss the results of the investigation with Ms. McGray and Ms. Ward.

33.     Those in attendance were Ms. McGray, Ms. Ward, Mr. Snow, Ms. Curtis, and Mr. Beake.

34.     Mr. Snow briefly discussed the results of the investigation with Ms. McGray and Ms. Ward.

35.     After that, Ms. Curtis changed the subject to over-staffing at the Rockport store and handed the conversation off to Mr. Beake.

36.     As Mr. Beake started to discuss staffing, Ms. McGray became extremely angry at Mr. Beake, insulting and yelling at him.

37.     Mr. Beake asked Ms. Ward to leave the room as she did not need to hear Ms. McGray's complaint.

38.     At first Ms. McGray told Ms. Ward to stay (an act of insubordination) and said that she did need to hear Ms. McGray yell at Mr. Beake and put him in his place.

39.     Ms. Ward eventually left and Ms. McGray continued to yell at and insult Mr. Beake.

40.     Ms. McGray eventually left the room stating that she was going to speak with President Susan Ware Page about Mr. Beake.

41.     During the entire time that Ms. McGray was yelling at, insulting, and disrespecting Mr. Beake, Ms. Curtis simply sat there and watched.  She did not say anything to admonish Ms. McGray or stop Ms. McGray from verbally abusing Mr. Beake.

42.     None of the female managers (Ms. McGray and Ms. Ward) or employees (Linda, Cindy, and Sue) received any type of disciplinary action for their involvement in creating a hostile work environment at the Rockport store.

43.     Ms. McGray did not receive any discipline for her insubordination or verbal abuse of Mr. Beake.

44.     Ms. Curtis's silence while Ms. McGray abused Mr. Beake undermined Mr. Beake's authority and tacitly endorsed Ms. McGray's abuse.

45.     Ms. Curtis also allowed Union Store Manager Karrie Heald to yell at Mr. Beake while he met with Ms. Heald to hold her (Ms. Heald) accountable for not performing her job duties.

46.     Ms. Heald consistently failed to adhere to Maine Department of Environmental Protection (MDEP) paperwork and guidelines; left the store safe unlocked, left the keys in the

store safe; did not bring bank deposits to the bank daily but instead, only once or twice per week; did not address employee issues and concerns; allowed her employees to take smoke breaks next to the propane cage which is illegal and dangerous; did not report that her office had been broken into; stored thousands of dollars' worth of lottery scratch tickets unsecured in a box under her desk; had ongoing large cash and lottery discrepancies; had missing safe funds; and more.

47.     When Mr. Beake and Ms. Curtis met with Ms. Heald to discuss her performance opportunities, Ms. Heald became very hostile and abusive towards Mr. Beake.

48.     Mr. Beake looked several times toward Ms. Curtis for guidance and support. During the entire meeting Ms. Curtis just looked at the floor and listened to Ms. Heald holler at and insult Mr. Beake.

49.     During a hearing before the Maine Bureau of Unemployment Compensation held on December 30, 2019 and January 8, 2020, ("UE Hearing"), Mr. Snow admitted that negative feedback from Ms. McGray and Ms. Heald were factors in the decision to terminate Mr. Beake's employment.

50.     This is remarkable given that Mr. Snow personally witnessed Ms. McGray verbally abuse Mr. Beake when he tried to hold her accountable for creating a hostile work environment in the store she managed.

51.     Mr. Snow acknowledged during the hearing that it was Mr. Beake's job to manage Ms. McGray and Ms. Heald and their performance, and address allegations of misconduct.

52.     During Mr. Beake's employment, he complained several times that Ms. Curtis was mistreating him.

53.     Mr. Beake's complaints about Ms. Curtis were made on 6/6/17, 1/29/18, 6/20/18, 4/23/19, 6/10/19, and 10/17/19.

54.     Mr. Beake complained truthfully that Ms. Curtis did not respect him, was rude and insulting to him, embarrassed him in front of his employees, and kept non-confidential information from him that she received during weekly meetings with the owners.

55.     Ms. Curtis held monthly meetings with the safety committee and never shared any information from those meetings with Mr. Beake.

56.     Ms. Curtis had monthly "All Managers" meetings which included all of the managers from the office, with the exception of Mr. Beake.

57.     Ms. Curtis shared information with female Store Managers before she shared it with Mr. Beake.

58.     Ms. Curtis allowed female Store Managers to go directly to her for decisions that Mr. Beake should have made.

59.     After he complained, Ms. Curtis would, for a short time, treat Mr. Beake better but then would revert back to her old ways and treat him poorly again.

60.     Mr. Beake was fired on October 31, 2019, shortly after he reported, in good faith, that Ms. Curtis rudely and forcefully told him to stop talking during a Store Manager meeting on October 17, 2019.

61.     This was Mr. Beake's sixth complaint about Ms. Curtis.

62.     Maritime Energy admits that Mr. Beake was fired for making complaints about Ms. Curtis.

63.     Defendant claims that Mr. Beake's complaints prove that he was not able to work effectively with Ms. Curtis.

64.     In contrast to this, Ms. McGray and Ms. Heald were not fired or even disciplined for their inability to work effectively with Mr. Beake without verbally abusing him.

65.     Defendant claims that Mr. Beake's complaints were disruptive to the company and undermined Ms. Curtis' ability to do her job.

66.     In contrast to this, Ms. McGray and Ms. Heald were not fired or even disciplined for complaining repeatedly about Mr. Beake and undermining his ability to do his job.

67.     Mr. Snow admitted during the UE Hearing that he investigated Mr. Beake's complaints against Ms. Curtis and never concluded that Mr. Beake lied about Ms. Curtis, or that he intentionally misrepresented facts for some reason, or that he was acting in bad faith.

68.     Mr. Snow also testified that Mr. Beake was never disciplined for making complaints about mistreatment by Ms. Curtis or warned that his job may be in jeopardy because of his complaints.

69.     After Mr. Beake was fired, most of his job duties were taken over by District Manager Snow, who is female.

<u>Pay Discrimination</u>

70.     From the time Mr. Beake was hired until July 2018, Maritime Energy had a bonus compensation structure that was intended, or had the effect, of providing the Store Managers (all female) with the ability to earn a higher bonus than the District Manager (Mr. Beake, male).

71.     Although Mr. Beake questioned Ms. Curtis many times about the discriminatory bonus structure, he did not have input into the new structure that was adopted in July 2018.

72.     The Store Managers found out about the new bonus structure before he did.

73.     Before July 2018, the District Manager's bonus was an average of the bonuses paid out to Store Managers.

8

74.     As a result, the District Manager (male) received a lower bonus than some of the Store Managers (female) he supervised.

75.     The only way the District Manager (male) could have earned the same bonus as the Store Managers (female) was for all of the Store Managers to achieve their full bonus potential.

76.     The October 2019 bonuses for District Managers and Store Managers were delayed and were not issued until after Mr. Beake was fired, depriving him of eligibility for the bonus he earned, worth about $1,000.

Sexual harassment

77.     Mr. Beake was also fired for complaining about sexual harassment.

78.     For several months leading up to April 2019, the Price Book Coordinator, Teresa Downing, said and did things to Mr. Beake that were sexual or based on sex, making him very uncomfortable.

79.     When a new employee was looking for Mr. Beake, Ms. Downing referred to him as "the tall, good-looking guy."

80.     When Ms. Downing came to Mr. Beake's desk to speak with him, she would sprawl herself onto his desk.  She would get so close that Mr. Beake could actually feel the heat coming off of her body and smell her breath.

81.     Ms. Downing approached Mr. Beake another time and put her hand on his shoulder while he was seated.

82.     Ms. Downing would leave Hershey Kisses for Mr. Beake on his desk.

83.     When Mr. Beake bent over to get something out of the trunk of his car, Ms. Downing came up behind him and said, "Would it be inappropriate if I whistled at you right now?"

84.     Ms. Downing told Mr. Beake that she had gone online and located his yearbook picture. This made Mr. Beake very uncomfortable. He wondered why she would do this. He wondered why she would tell him she did this. He felt a bit like she was stalking him. Mr. Beake tried to look at his own yearbook picture after hearing what Ms. Downing said, to see if it was possible to find his picture online. Mr. Beake could only find online yearbook resources that you needed to pay for to view. He wondered if that meant that she paid to look at his picture.

85.     Ms. Downing spoke freely about her lack of a sexual relationship with her husband in the middle of the office which several people overheard.

86.     After each of most of the above-listed instances, Mr. Beake reported Ms. Downing's conduct to Mr. Snow.

87.     Each time Mr. Beake reported feeling uncomfortable with Ms. Downing's conduct, the only advice Mr. Snow gave Mr. Beake was to tell Ms. Downing that he did not appreciate what she was doing or saying.

88.     In spite of Mr. Beake's reported concerns, Mr. Snow did not investigate, no corrective action was taken, and the harassment continued.

89.     Mr. Beake was very apprehensive about making a formal complaint against Ms. Downing for a couple of reasons.

90.     First, Ms. Downing worked in the office and reported directly to Ms. Curtis.

91.     Second, Mr. Beake had been told by numerous people that Ms. Downing was Ms. Curtis's "pet" and "narc" (informant) and to never say anything bad about her.

92.     On April 19, 2019, Mr. Beake spoke with Mr. Snow again and said he wanted to make a formal complaint against Ms. Downing.

93.     Mr. Snow asked Mr. Beake if he had told Ms. Curtis what Ms. Downing had been doing. Mr. Beake said he had not. Based on the way Ms. Curtis treated Mr. Beake, he had zero faith that she would take his complaint seriously.

94.     Mr. Snow told Mr. Beake that he had to let Ms. Curtis know about his complaint because she was Ms. Downing's supervisor.

95.     On April 22, 2019, Ms. Curtis approached Mr. Beake at his desk first thing in the morning.  She was very unfriendly in her tone and demeanor.  She told Mr. Beake that she was going to be speaking with Ms. Downing when she arrived. Ms. Curtis did not say anything directly about Mr. Beake's complaint but he believed she was referring to his complaint.

96.     Shortly after Ms. Downing arrived, she went into Ms. Curtis's office alone and the door was closed.

97.     Mr. Beake needed to speak with Mr. Snow about some employee HR issues so 5-10 minutes later, he headed to Mr. Snow's office.  Mr. Snow mentioned that once Ms. Curtis and Ms. Downing arrived, they would be meeting to discuss Mr. Beake's concerns.  Mr. Beake told Mr. Snow that they were both already there and meeting behind closed doors and had been for at least 10 minutes.  Mr. Snow appeared panicked and said, "I should be there," and immediately emailed Ms. Curtis.  Ms. Curtis called Mr. Snow shortly after that and Mr. Snow left his office to join Ms. Downing and Ms. Curtis in Ms. Curtis's office.

98.     Approximately 20 minutes later, Mr. Snow approached Mr. Beake and asked if he would come with Mr. Snow to Ms. Curtis's office.

99.     Mr. Beake met with Ms. Downing, Mr. Snow, and Ms. Curtis.

11

100.    Mr. Snow told Mr. Beake that they had discussed Mr. Beake's sexual harassment complaint.

101.    Ms. Downing apologized to Mr. Beake and was crying.

102.    Ms. Curtis said that Ms. Downing was a very intelligent person and that they would be working on her being more professional and respecting peoples' bubbles.

103.    Mr. Snow asked if Mr. Beake would be able to continue to work with Ms. Downing.  He said yes.

104.    Mr. Snow then asked Ms. Downing the same question and she said, "As long as he wipes that smirk off his face."

105.    Mr. Beake did not realize that he appeared to be smirking but may have expressed doubt on his face because he did not think Ms. Downing was being genuine. The whole thing felt staged to Mr. Beake.  Mr. Beake told Ms. Downing that he did not think that she truly understood or appreciated what she had said and done.

106.    During the meeting Mr. Beake noticed Ms. Curtis several times looking at him with a stern face and got the impression that she was angry at Mr. Beake for reporting Ms. Downing.

107.    Ms. Downing and Mr. Beake both left Ms. Curtis's office and Mr. Snow and Ms. Curtis remained behind and closed the door.

108.    Mr. Beake was upset over the meeting so he returned to his desk and avoided interaction with anyone until he could calm down.

109.    Ms. Downing returned to her desk and immediately started returning phone calls. She was no longer crying or upset and was very upbeat. Mr. Beake did not understand how she was able to compose herself so quickly if she was truly upset.

110.    The only discipline Ms. Downing received was a verbal warning, because – according to Defendant – she was "genuinely shocked" and "remorseful."

111.    Mr. Beake did not think Ms. Downing's display of remorse was genuine, and he was right.

112.    When Ms. Downing left the meeting, she immediately started gossiping with co-workers about Mr. Beake – calling him an "ass" – and bragging that Ms. Curtis was not mad at her.

113.    As Mr. Beake feared, Ms. Curtis retaliated against him for complaining about Ms. Downing.

114.    On April 23, 2019, Ms. Curtis and Mr. Beake had an impromptu meeting.  She criticized Mr. Beake's performance for the last few months as it related to two new stores that Maritime Energy had recently purchased.  She told Mr. Beake that she felt that he was overwhelmed and that he was not being helpful.

115.    Ms. Curtis mentioned, as an example, a day when Mr. Beake worked nine hours – while he was sick – and that "employees" complained that he "left early." (It was Ms. Downing and Ms. Curtis who complained.)

116.    Mr. Beake reminded Ms. Curtis that he had been sick that day. She insulted Mr. Beake by responding, "I guess some of us have more stamina than others."

117.    Mr. Beake became defensive and told Ms. Curtis that he had never been treated so poorly before.  The discussion got heated.  Ms. Curtis asked if she should go and get Mr.  Snow.  Mr. Beake told Ms. Curtis that was not necessary.  He felt like he was fighting a losing battle but did his best to calm down.

118.    On April 25, 2019, Mr. Beake was told by a fellow employee that Ms. Downing was gossiping about his sex harassment complaint and the private conversation that she had with Ms. Curtis about it.

119.    Mr. Beake was told that Ms. Downing was talking about Mr. Beake's sexual harassment complaint in the main office as well as at the stores.

120.    Mr. Beake learned that Ms. Downing was telling employees in person and via email that before Mr. Snow joined their meeting, Ms. Curtis told Ms. Downing not to worry about it and that she wasn't mad.

121.    This explains why, when Ms. Downing left the meeting, she acted as if nothing had happened.  She was not worried because Ms. Curtis told her it was no big deal.

122.    Knowing that employees, including his direct reports, knew that he had complained about being sexually harassed and that Ms. Downing was gloating about getting away with it was a complete embarrassment to Mr. Beake.

123.    On April 25, 2019, Mr. Beake brought his concerns about Ms. Downing's and Ms. Curtis' retaliation to Mr. Snow's attention.

124.    Mr. Snow summarily dismissed Mr. Beake's complaint about Ms. Curtis' retaliation, with no investigation.

125.    Mr. Snow told Mr. Beake that he would speak with Ms. Curtis about Ms. Downing.

126.    According to Defendant's submission to the MHRC, Mr. Snow investigated Mr. Beake's complaint, spoke to at least half a dozen employees who confirmed that Ms. Downing was talking about Mr. Beake's sexual harassment complaint, and telling people that Ms. Curtis had told her she had nothing to worry about and had done nothing wrong.

14

127.    Mr. Snow concluded that Ms. Downing "learned little, if nothing, from the 4/22/19 meeting" and used it as "fuel for further aggressions" against Mr. Beake.

128.    The only consequence proposed for Ms. Downing's intentional and blatant misconduct was a written warning and retraining on the company's harassment/bullying policy.

129.    On Thursday, May 2, 2019, Ms. Downing left work early and never returned.

130.    Maritime Energy states that Ms. Downing quit on May 2, 2019 when she was confronted about the new accusations, but that doesn't make sense.

131.    The draft written warning indicates that Ms. Downing was confronted with the new accusations on April 25, 2019. The draft warning is not signed by Ms. Downing or Mr. Snow, so it appears that it was never presented to Ms. Downing on May 2, 2019, or any other date, not even when Ms. Downing was rehired in December 2019.

132.    One of the Store Managers told Mr. Beake to watch his back because Ms. Curtis would most certainly get back at him for complaining about sexual harassment and retaliation, and for causing Ms. Downing's departure.

133.    Despite Ms. Downing's blatant misconduct she was allowed to return to work at Maritime Energy in December 2019, after Mr. Beake was fired.

134.    Upon information and belief, Ms. Downing was allowed to return to work without a written warning on her record for sexual harassment or retaliation.

<u>Other evidence of sex discrimination</u>

135.    Jefferson Store Manager BJN (female) has a criminal record of conviction for embezzling $160,000.

136.    Mr. Beake discussed this with Mr. Curtis and Mr. Snow and learned that they knew about Ms. BJN's criminal record when she was hired.

137.     In contrast to this, Maritime Energy refused to hire multiple male employees with criminal records involving any type of theft.

138.     A female employee (WR), managed by Ms. Heald, was caught stealing on camera and was not fired.

Whistleblower activity

139.     During Mr. Beake's employment, he reported concerns about a number of unsafe and illegal conditions including but not limited to: (a) exposed fiberglass insulation which posed a health risk; (b) a Store Manager's failure to complete paperwork required by the MDEP; (c) Ms. Curtis advising a Store Manager to backdate MDEP paperwork; (d) the company selling gas at locations that lacked important safety features in violation of the law, and (e) violations of Maine smoking laws.

Fiberglass insulation

140.     The Tolman Pond Market in Rockport was purchased by Maritime Energy in December 2016.

141.     At the time of purchase, there was exposed fiberglass insulation in the storage room.

142.     Ms. Page and Ms. Curtis observed the exposed insulation before and after the purchase.

143.     During Mr. Beake's first Safety Inspection of the Tolman Pond Market store, he emailed Ms. Curtis items that needed to be repaired, including the exposed insulation, because Ms. Curtis was in charge of store maintenance.  Ms. Curtis responded, "It's on the list."

144.     Mr. Beake brought up his concerns about the exposed insulation several times over the next 18 months.

145.    The exposed insulation was less than four feet away from a 24" fan.

146.    Fiberglass insulation dust covered cans and boxes of food, pizza boxes, condiments, utensils, and other food and drink containers.

147.    There were sparkling strands in the dust particles which is why Mr. Beake recognized that it was fiberglass dust.

148.    Mr. Beake was told by then-Store Manager Erika Petereit that she along with many of her employees always felt sick while in the building and would feel better after leaving for the day.  Ms. Petereit mentioned several employees with respiratory related issues.

149.    Mr. Beake researched fiberglass insulation and learned that it contains formaldehyde and that when airborne, that it can cause major respiratory related issues.

150.    On June 14, 2018, 18 months after purchasing Tolman Pond Market, Mr. Beake sent Ms. Curtis an email and asked her once again, when the insulation would be covered up. He added, "Or are we just going to wait until somebody gets sick?"

151.    Ms. Curtis expressed anger that Mr. Beake was pushing the company to fix a known health hazard.

152.    Ms. Curtis told Mr. Beake that he needed to learn how to properly speak to people.

153.    It took several more months but the insulation was finally covered.

154.    Defendant admits that there was exposed fiberglass insulation in the Tolman Pond Store, and that Mr. Beake reported concerns about it to Ms. Curtis.

155.    Defendant also admits that Mr. Beake reported concerns about fiberglass dust.

156.    Defendant claims, however, that Mr. Beake should have asked maintenance personnel to clean it up, which Mr. Beake disputes.

157.     First, as noted above, Ms. Curtis supervised the maintenance staff, not Mr. Beake.

158.     Second, Maritime Energy claims that the issue was "normal" dust, not fiberglass, but this determination was allegedly made by Ms. Petereit, not an expert.

159.     Mr. Beake told Ms. Page at the time that the only way to determine if the dust contained fiberglass was to send samples to a lab to be tested. This was not done.

160.     Third, special methods need to be used to clean up fiberglass dust to avoid spreading the contamination, including wet mops and cloths and a vacuum cleaner equipped with a HEPA filter. These methods were not used.

161.     Fourth, Maritime Energy did eventually cover up the exposed insulation with plastic and 4' x 8' panels.

162.     If the exposed insulation was not a hazard and did not pose a health risk to employees, there would be no reason to cover it up.

<u>MDEP regulations</u>

163.     Mr. Beake reported concerns to Ms. Curtis about Store Managers Heald, McGray and others failing to complete paperwork that is required by the MDEP.

164.     Defendant is legally required to complete the paperwork.

165.     The paperwork in question documented inspection by the Store Manager of the following:  proper functioning of the Release Detection system; checking the Electronic Overfill Alarm (which would ensure that fuel delivery persons did not overfill fuel tasks leading to spillage); ensuring proper use and maintenance of Spill Logs; Spill Buckets; ensuring that Spill and Overfill Supplies were inventoried  and appropriately stocked;  inspecting and ensuring proper functioning of Fill and Monitoring Ports; ensuring that Dispensers and Dispenser Sumps

were in working order and free from leakage; ensuring that Dispenser Hoses, Nozzles, and Breakaways were in good condition.

166.    The inspection items on the MDEP paperwork ensured that the Defendant's stations complied with the legal requirements for preventing and addressing spills and the associated environmental harm associated with spills.

167.    Certain Store Managers freely admitted that the inspections that are supposed to be documented in the paperwork had not taken place.

168.    Ms. Curtis told Mr. Beake to backdate MDEP paperwork so that Maritime Energy would not be fined if the MDEP did an inspection. He refused.

169.    Ms. Curtis and Mr. Beake discussed this issue directly with Ms. Heald.

170.    Ms. Curtis told Ms. Heald to backdate the paperwork. Mr. Beake believes that Ms. Heald complied with her directive.

171.    During the UE Hearing, Ms. Curtis admitted under oath that she directed a Store Manager to backdate MDEP paperwork.

172.    In late 2018, Mr. Beake finally called the MDEP. Mr. Beake told a representative who he was and reported that he had been asked several times by his supervisor to falsify MDEP paperwork.  The MDEP representative told Mr. Beake that she knew Ms. Page and that she had been speaking with her recently in regards to concerns about some of Maritime Energy's stores. Mr. Beake asked for advice on how to handle what he was being asked to do.

173.    Mr. Beake did not bring this issue to the attention of Ms. Page because of how she had reacted to previous similar situations in the past.

174.    In response to Mr. Beake's complaint to the MHRC, Maritime Energy claimed that some stores had blank spill logs because no spills had occurred.

175. This is not plausible.

176. There were stores with blank spill logs month after month even though the average store had multiple spills in any given week. This is a common occurrence at any gas station, not just Maritime Farms.

177. The spill logs were blank because no one recorded the spills, which is illegal.

Fire safety regulations

178. The MDEP and the Maine State Fire Marshal require certain safety features to be in place in order to sell fuel after hours when stores are closed. This includes a very specific fire suppression system as well as an emergency stop and telephone that dials 911 that the public can access in the event of an emergency.

179. Mr. Beake noticed that Maritime Energy was selling fuel at several locations after hours without the required safety equipment.

180. Mr. Beake was very concerned because the locations in question were permitting customers to pump fuel without any employees present and in the event of a fire there would be no staff to help address a fire. Therefore, the automated equipment was necessary to protect the public from dangers associated with a fire at the location.

181. In about June 2018, Mr. Beake had a conversation with Ms. Page, in the presence of Mr. Snow, about the company selling fuel at several locations after hours without the required equipment and his concerns about the threat this posed to public safety.

182. Ms. Page told Mr. Beake that she was aware of the regulatory requirements but she would not be installing any of them until she was forced to by the MDEP or the State Fire Marshal.

183.   A few months later the State Fire Marshall conducted inspections of these locations and Maritime Energy was forced to stop selling fuel until they were compliant.

184.   The same thing happened at two new locations that were purchased in April 2019, Perry's Store in Stockton Springs and Steamboat in Searsport.

185.   Mr. Beake waited several months to see if Maritime Energy was going to install the safety equipment that is required in order to sell fuel when the store is closed.

186.   After several months, Mr. Beake asked Ms. Curtis when Maritime Energy would be installing the required safety equipment.  She informed Mr. Beake that there were no immediate plans to do so.

187.   Mr. Beake called the State Fire Marshall's office and spoke with Supervisor Ronald Peaslee sometime in early October 2019, not long before he was fired.

188.   Defendant claims that it was unaware that Mr. Beake called the Fire Marshall's office before receiving Mr. Beake's discrimination complaint.

189.   However, Ms. Page, Mr. Snow, and Ms. Curtis all knew that Mr. Beake had reported concerns about the company illegally selling fuel after hours without fire suppression systems.

190.   Defendant also claims that Maritime Energy was "grandfathered" by the fire marshal and MDEP and allowed to sell fuel overnight without a fire suppression system at several locations, which Mr. Beake disputes.

191.   No one told Mr. Beake that any location was "grandfathered" while he was employed.

Maine's Workplace Smoking Act

192.    Maine law prohibits smoking inside workplaces or within 20 feet from the entryways and doorways of the workplace.

193.    Enforcing the law was not important to Ms. Curtis and, by extension, the Store Managers.

194.    For at least two years, maybe more, Mr. Beake stressed to Ms. Curtis and Mr. Snow the importance of following the Workplace Smoking Act.

195.    Mr. Beake reported that employees were smoking right at the front doors at the stores and at the back doors at the office.

196.    For example, Ms. Heald, the Union store manager, allowed her employees to smoke directly next to the propane cage. Mr. Beake sent a picture of the cigarette butt can - inches from the propane cage – to Mr. Snow.

197.    Smoking next to the propane cage created an unacceptable risk of fire and explosion.

198.    Mr. Beake wanted disciplinary action to be taken against the employees responsible and/or Ms. Heald.

199.    Ms. Curtis' consent or approval for any discipline was needed.

200.    No discipline was authorized or taken.

201.    Defendant admitted to the MHRC that Mr. Beake told Mr. Snow that employees were smoking too close to the building at the main office.

202.    Defendant did not admit or deny to the MHRC that Mr. Beake reported concerns about smoking to Ms. Curtis.

203.     Smoking violations were also happening at the main office.

204.    Employees smoked directly next to multiple exits and windows.

205.    Mr. Beake brought this to Mr. Snow. He told Mr. Beake he forwarded his concerns to Operations Manager Steve Conforth. No corrective action was taken.

206.    In April 2019, Mr. Beake finally called the Maine Attorney General's office and spoke with Amber in smoking enforcement. Mr. Beake told Amber who he was and why he was calling.  Amber told Mr. Beake that she would put together a letter and send it to Maritime Energy asking about their smoking policy, which she did.

207.    A short time later, Ms. Page called Mr. Beake into her office. Instead of expressing concerns that employees were violating the law, Ms. Page was intent on finding out who called the State. Ms. Page asked Mr. Beake, "Who do you think could have filed a complaint?"

208.    Preferring to remain anonymous, Mr. Beake told Ms. Page that he did not know anything about it.

209.    However, Ms. Curtis and Mr. Snow were aware of Mr. Beake's previous efforts to get Maritime Energy to comply with the State's smoking laws, and likely told Ms. Page that he was the one who made the report.

<u>Defendant's Stated Reasons for Termination</u>

210.    Mr. Beake always performed the duties of his job in a satisfactory manner or better.

211.    Over the years, he always received satisfactory performance evaluations from Ms. Curtis.

212.    On October 1, 2019, Mr. Beake received a performance evaluation from Ms. Curtis that was positive and which reflected that he met or exceeded expectations in 23 of 24

areas with one "needs improvement" rating in the area of "works with key deli to offer lunch specials."

213.    On October 31, 2019, Mr. Beake was fired by Maritime Energy.

214.    The only reason for termination given to Mr. Beake at the time he was fired was that his complaints about mistreatment against Ms. Curtis were unfounded.

<u>Shifting reasons - was Mr. Beake fired for making complaints about Ms. Curtis, or not?</u>

215.    On the termination form created by Defendant on October 31, 2019, the stated reason for Mr. Beake's termination was as follows:

> "On 10/18/19 you emailed Human Resources claiming that Charon Curtis, your supervisor, rudely told you to stop talking at the 10/17/19 Store Manager's meeting. Jeff Snow, the HR Manager, spoke with all the managers that were there and no one heard what you are claiming. The closest response was one person did hear Charon say stop, but it was addressed to the group as a whole because many started talking at once. The evidence finds your claim unfounded. You have made past accusations of harassment against your supervisor as well that were determined to be unfounded...Tony, your continued accusations that have been determined to be unfounded against your supervisor are harassment against her. You have agreed in the past that you have taken comments the wrong way. Ironically, in the past there have also been complaints from your direct reports in how you have spoken to them. These continued acts to undermine your supervisor, and in effect the company, will not be tolerated and show a disregard for the wellbeing of your employer."

No other reasons were provided for the termination.

216.    Defendant provided the MHRC with conflicting information about the stated reason for Mr. Beake's termination.

217.    On the one hand, Defendant said that Mr. Beake's complaints about Ms. Curtis "had nothing to do with the reason for Mr. Beake's termination."

218.    On the other hand, when asked to list and explain in detail all reasons for Complainant's discharge, Defendant told the MHRC:

> "...Throughout his employment, Mr. Beake engaged in a pattern of making formal complaints about Ms. Curtis, claiming that she "bullied" or "harassed him" ... it became

clear that he was simply not a good fit and that it wouldn't work after he made a complaint in October of 2019 that Ms. Curtis was rude and unprofessional toward him at a store manager meeting that month…"

219.    Prior to Mr. Beake's termination he never received any discipline in connection with his reports regarding negative treatment by Ms. Curtis.

220.    Prior to Mr. Beake's termination he was never notified that he should stop making reports regarding Ms. Curtis' negative treatment of him, and that if he made more reports, his job would be in jeopardy.

221.    Mr. Beake's reports were well founded and made in good faith and supported by detailed facts.

222.    Neither Mr. Snow nor Ms. Page ever indicated to Mr. Beake before he was fired that they believed his reports regarding Ms. Curtis were false or unfounded.

223.    During the UE Hearing, Ms. Page testified under oath that Ms. Curtis was involved in the decision to terminate Mr. Beake's employment.

224.    During the UE Hearing, Ms. Page and Mr. Snow testified, under oath, that they had determined that Mr. Beake's reports of negative treatment by Ms. Curtis were false and unfounded. When pressed for evidence and the basis for their testimony that Mr. Beake's reports were unfounded, Ms. Page and Mr. Snow were not able to provide specifics.

225.    Defendant did not claim, in its submission to the MHRC, that Mr. Beake's complaints were false and unfounded. Instead, Defendant said that Mr. Beake's "perception of reality" was incorrect.

226.    The UE hearing officer awarded unemployment benefits to Mr. Beake and found that Maritime Energy had failed to present evidence to support the claim that Mr. Beake's reports regarding Ms. Curtis were false or unfounded.

Reason offered then withdrawn #1
(Beake was allegedly fired for harassing Ms. McGray and Ms. Heald)

227.    During the UE Hearing, witnesses for Maritime Energy including Ms. Page and

Mr. Snow alleged that Mr. Beake was terminated in part for harassing Store Managers, Ms.

Heald and Ms. McGray.

228.    This excuse was added after Mr. Beake's termination, and then (apparently)

withdrawn; it was not included as a reason for termination in Defendant's submission to the

MHRC.

229.     Regarding Ms. McGray, witnesses for Maritime Energy claimed that Ms.

McGray complained that she had never been called into the office more often in the 25 years she

had been with the company than while Mr. Beake worked there.

230.    To ensure that employee complaints were handled properly, Mr. Beake continued

to pass on to Mr. Snow the complaints he heard from employees at the Rockport store. He also

emailed Mr. Snow pictures of rude and abrasive signs that Ms. McGray hung throughout the

store. Mr. Snow asked Mr. Beake to take down the signs and bring them back to the office. Mr.

Beake complied, and gave them to Mr. Snow. There were dozens of them in a box in Mr. Snow's

office.

231.    The Rockport store had a tremendous amount of employee turnover, possibly the

highest out of all 13 stores.

232.    Mr. Beake concluded that the Rockport stores turnover was this high because of

how Ms. McGray mistreated people.

233.    Mr. Snow agreed with Mr. Beake.

234.    Ms. Curtis blamed it on the fact that the store was so busy.

235.    Ms. Curtis covered for and stuck up for Ms. McGray claiming that she was "old school."

236.    In his efforts to hold Ms. McGray accountable for the performance of the Rockport store, Mr. Beake was just doing his job and trying to get a Store Manager to perform her job in a satisfactory manner.

237.    Mr. Snow admitted as much during the unemployment hearing.

238.    The same is true with Ms. Heald.  Ms. Heald had performance issues and Mr. Beake worked, in conjunction with Mr. Snow, to address those performance issues.  Mr. Snow admitted as much during the unemployment hearing.

Reason offered then withdrawn #2
(Beake was allegedly fired for making Ms. Curtis and Ms. McGray uncomfortable)

239.    During the UE Hearing, witnesses for Maritime Energy including Ms. Page and Mr. Snow alleged that Mr. Beake was terminated in part for making Ms. Curtis and Ms. McGray feel uncomfortable being in a room by themselves with him.

240.    Mr. Snow claimed that Ms. Curtis reported feeling uncomfortable meeting with Mr. Beake alone as far back as 2018.

241.    These claims are false.

242.    Maritime Energy did not include these claims in its submission to the MHRC.

243.    Mr. Beake spent a considerable amount of time with Ms. Curtis when they were completely alone.

244.    This occurred in her office with the door closed quite regularly.

245.    Ms. Curtis and Mr. Beake were at an Irving branded store shortly before Mr. Beake's termination. They took pictures of shelving and fixtures. They removed three TV's that were mounted to the walls.  They were there for over an hour, alone. They chatted about their

27

respective health problems. There was no sign whatsoever that Ms. Curtis was uncomfortable being alone with Mr. Beake.

246.    The claim that Ms. Curtis was uncomfortable being alone with Mr. Beake and that Mr. Beake was terminated on this basis is unfounded and implausible.

247.    The same thing is true with Ms. McGray. She and Mr. Beake were often together in her office at the Rockport store with the door closed discussing store issues, and even issues about Ms. McGray's personal life that she raised.  Ms. McGray shared a considerable amount of personal information with Mr. Beake. The claim that Ms. McGray to was afraid to be alone with Mr. Beake is unfounded and implausible.

Same actor inference

248.    In its submission to the MHRC, Maritime Energy mistakenly relied on the so-called "same actor inference" because Ms. Curtis hired, or participated in the hiring of, Mr. Beake.

249.    Based on overwhelming social science research, both courts and the EEOC have repeatedly rejected this rigid doctrine as inconsistent with the reality of how discrimination occurs in the workplace. See, e.g., *Waldron v. SL Indus., Inc*., 56 F.5d 491, 496 n.6 (3rd Cir. 1995) (refusing to apply same actor inference in part based on EEOC's rejection of the inference as inconsistent with reality of how discrimination occurs in the workplace);  *Wexler v. White's Fine Furniture, Inc*., 317 F. 3d 564, 573-74 (6th Cir. 2003) (en banc) (ruling that the trial court incorrectly relied on the same actor inference in granting summary judgment to employer); Linda Krieger & Susan Fiske, *Behavioral Realism in Employment Discrimination Law: Implicit Bias and Disparate Treatment*, 94 California Law Review 997 (2006).

Mr. Beake was proactive or "hands on" in his role as District Manager

250.    In its submission to the MHRC, Maritime Energy alleged that Mr. Beake was not proactive or "hands on" in managing the stores, which is not true.

251.    Mr. Beake frequently assisted stores in putting away their weekly deliveries, ran the register to cover an employee break, picked up Uncle Henry's at the Post Office, brought daily deposits to the bank, delivered supplies from one store to another, filled beer/soda coolers, emptied the trash, cleaned up fuel spills, and more.  Store Managers expressed appreciation for his help.

252.    Specific examples of Store Managers who witnessed Mr. Beake assisting, who asked Mr. Beake for assistance, or worked hand-in-hand while Mr. Beake assisted, include the following:

- Townline (Cassandra Grant): Core-Mark, Wine Delivery, liquor delivery, filling cooler, bank deposits, Uncle Henry's, trash, fuel spills, cleaning pumps, cigarette/liquor audits.
- South End (Betty Dyer): Core-Mark, filling cooler, bank deposits, trash, fuel spills, cleaning pumps, sanding/shoveling.
- Riverside (Stephanie Viens): Core-Mark, filling cooler, bank deposits, trash, fuel spills, sanding/shoveling, Uncle Henry's, Dennis order, running register.
- Tolman Pond (Lisa Taylor): Core-Mark, filling cooler, organizing/cleaning back room, bank deposits, sanding/shoveling, picking up meat order, transferring store product.
- Rockport (Pat McGray): Trash, filling cooler, sanding/shoveling, Liquor order, organizing/cleaning back room, Core-Mark, cigarette/ liquor audits, Dennis order, transferring store product.
- Warren (Stephanie Veins/Kim Weaver): filling cooler, sanding/shoveling, liquor order, trash, bank deposit, transferring store product, fuel spills.
- Belmont (Lori Shepard): Core-Mark, sanding/shoveling, liquor order, fuel spills, cleaning pumps.
- Searsport-Steamboat/Stockton Springs-Perry's (Karrie Heald): Cleaning/organizing entire store, liquor order, liquor/cigarette audits, assisting with reconciling daily shortages for cash, checks, fuel, liquor, cigarettes, lottery, laundromat and car wash funds, bank deposits, fuel spills, purchasing dump stickers at town office.
- Union (Michelle Ripley): Fuel spills, filling cooler, bank deposits, Core-Mark, store product transfers, resetting the alarm system on Thanksgiving Day 2016 (while store was managed by Ms. Heald).

253.    The claim that Mr. Beake was terminated for failing to be proactive or "hands on" is unfounded and implausible.

<u>Mr. Beake did not lack initiative to solve problems, or to propose solutions</u>

254.    In its submission to the MHRC, Maritime Energy alleged that Mr. Beake did not take the initiative to solve problems on his own, or to propose solutions, which is not true.

255.    Mr. Beake did as much as he was permitted to do, without exceeding his authority.

256.    Mr. Beake partnered with Ms. Curtis and Mr. Snow and brought problems to their attention when appropriate and when asked to do so. For example, Ms. Curtis was in charge of facilitating store maintenance, so Mr. Beake brought these issues to her.

257.    Examples of safety concerns that Mr. Beake brought to Ms. Curtis's attention after completing Store Safety Inspections include but are not limited to the following: Trip hazards like broken and missing floor tiles, non-compliant or failed fire suppression systems, inoperable emergency lights and exit signs, sink drains leaking onto floors, inoperable exterior lights, lifting thresholds and carpeting, expired fire extinguishers, HVAC systems containing considerable amounts of mold spores, low-lying parking lot sections that contained water and turned to ice in the winter, parking lot potholes which often exceeded 12" in diameter and 6" in depth, uneven cement walkway transitions, and more.

258.    When Ms. Curtis criticized Mr. Beake for "not taking the initiative" to cover worn floor tiles with mats," she was being defensive about her own neglect of a maintenance issue that had been on her list to fix for months.

259.     Ms. Curtis became very upset with Mr. Beake for taking care of problems without involving her. Mr. Beake was told that he needed to consult with Ms. Curtis before implementing changes.

260.     The claim that Mr. Beake was terminated for lacking initiative to solve problems or propose solutions is unfounded and implausible.

<u>Mr. Beake did not threaten anyone</u>

261.     During the UE Hearing, Ms. Curtis claimed that when Mr. Beake commented about needing to "blow up" or "vent," she took it as a potential threat of violence

262.     Mr. Beake admits that at times he felt the need to "vent" when Ms. Curtis mistreated him because of his sex.

263.     Ms. Curtis did nothing to stop female managers, Ms. Heald and Ms. McGray, from verbally abusing Mr. Beake.

264.     When the two female Store Managers abused Mr. Beake, she justified it and commented, "Sometimes employees get emotional when they are frustrated and upset and they take it out on their boss."

265.     During the UE Hearing, Ms. Page went even further and claimed that a few weeks before Mr. Beake's termination, she was so concerned about reports and complaints she was getting from employees about Mr. Beake being threatening and angry that she asked if he owned guns and was concerned for her employee's safety.

266.     This allegation isn't true.

267.     Mr. Beake did not say or do anything threatening about weapons, as asserted by Defendant.

268.     Mr. Snow and Ms. Page both brought guns to work; Mr. Beake did not.

269.     When Ms. Page was asked to explain what caused employees to fear Mr. Beake, she could only provide general statements about his "physical presence' and his "anger."

270.     Ms. Page admitted that her alleged concern that Mr. Beake was going to harm employees was not a factor in her decision to terminate Mr. Beake's employment. This tends to show that Ms. Page is willing to exaggerate and even falsify claims against Mr. Beake in order to justify his termination.

271.     Defendant has admitted that Plaintiff was terminated because of his protected reports regarding unlawful sex discrimination and hostile work environment.

272.     Plaintiff was treated differently and worse than similarly situated female coworkers because of sex and that his sex was a motivating factor in this disparate treatment.

273.     The timing of Plaintiff's protected activity and termination evidences a causal connection.

274.     The fact that Defendant has provided pretextual explanations for Mr. Beake's termination and otherwise dissembled the evidence to cover up its unlawful motives evidences discrimination and retaliation.

275.     The fact that Defendant's managers have provided false information with regard to the relevant facts in this matter evidences discrimination and retaliation.

276.     Plaintiff here alleges that Defendant discharged Mr. Beake and otherwise discriminated against Mr. Beake with respect to his compensation, terms, conditions, and privileges of employment, because of Mr. Beake's sex.

277.    Plaintiff here alleges that Defendant discriminated against Mr. Beake because Mr. Beake opposed sexual harassment, an act or practice that is unlawful under Title VII and the MHRA.

278.    Plaintiff here alleges that Defendant discriminated against Mr. Beake because Mr. Beake opposed discrimination on the basis of sex, an act or practice that is unlawful under Title VII and the MHRA.

279.    Plaintiff here alleges that Defendant discharged, threatened and otherwise discriminated against Mr. Beake regarding Mr. Beake's compensation, terms, conditions, location or privileges of employment because Mr. Beake, acting in good faith, reported to Defendant and to public bodies what Mr. Beake had reasonable cause to believe were violations of state and federal laws or rules.

280.    Plaintiff here alleges that Defendant discharged, threatened and otherwise discriminated against Mr. Beake regarding Mr. Beake's compensation, terms, conditions, location or privileges of employment because Mr. Beake, acting in good faith, reported to Defendant and to public bodies, what Mr. Beake had reasonable cause to believe were conditions and practices that would put at risk the health or safety of employees and members of the public.

281.    Plaintiff here alleges that Defendant coerced, intimidated, threatened or interfered with Mr. Beake in the exercise or enjoyment of the rights granted or protected by the MHRA.

282.    Defendant violated Plaintiff's rights with malice and reckless disregard for his statutorily protected rights.

<u>COUNT I: MHRA</u>

283.    Paragraphs 1-282 are incorporated by reference.

284.    Defendant's conduct violates the MHRA.

<u>COUNT II: Title VII</u>

285.    Paragraphs 1-284 are incorporated by reference.

286.    Defendant's conduct violates Title VII.

<u>COUNT III: WPA</u>

287.    Paragraphs 1-286 are incorporated by reference.

288.    Defendant's conduct violates the WPA.

<u>PRAYER FOR RELIEF</u>

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of his rights;

B.    Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C.    Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E.    Award equitable-relief for back pay, benefits and prejudgment interest;

F.    Award compensatory damages in an amount to be determined at trial;

G.    Award punitive damages in an amount to be determined at trial;

H.    Award nominal damages;

I.    Award attorney's fees, including legal expenses, and costs;

J.    Award prejudgment interest;

K.    Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of sex, retaliation, or whistleblower retaliation;

L.      Require Susan Ware Page to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

M.      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N.      Require that Defendant train all management level employees on the protections afforded by the MHRA, Title VII and WPA;

O.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated him because of sex discrimination, retaliation, and whistleblower retaliation; and

P.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  September 18, 2020                          */s/* Chad T. Hansen
                                                   Attorney for the Plaintiff

                                                   EMPLOYEE RIGHTS GROUP
                                                   92 Exchange Street 2nd floor
                                                   Portland, Maine 04101
                                                   Tel. (207) 874-0905
                                                   Fax (207) 874-0343
                                                   chad@employeerightslaw.attorney

35